```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VASEN REGAN                     :        CIVIL ACTION
                                :
         v.                     :
                                :
MICHAEL D. OVERMYER, et al.     :        NO. 19-1502
```

MEMORANDUM

Bartle, J.                                          July 19, 2023

Before the court are the objections of petitioner Vasen Regan to the Report and Recommendation of Magistrate Judge Pamela A. Carlos recommending the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.

I

Regan petitions to set aside his 2008 conviction for first-degree homicide arising from the fatal shooting of Darrick Hampton at a late-night basketball game at the Mill Creek Playground in West Philadelphia. He asserts that his trial counsel provided him ineffective assistance in violation of the Sixth and Fourteenth Amendments to the Constitution.

Hampton was killed by multiple gunshots late on the night of July 31, 2006. There was a crowd of approximately 50 people at the playground at the time of the shooting, but none volunteered any information to the Philadelphia Police officers who arrived on the scene. Four bullet cartridges fired from a

single gun were recovered, but the Commonwealth was unable to find any other usable forensic evidence from the crime scene.

Three purported witnesses with some personal knowledge of Hampton's killing were later interviewed by police. Each implicated Regan in the shooting. However, one witness did not show up at trial, and the other two later recanted the portions of their inculpatory statements to the police.

Richard Johnson, one of the three, testified at Regan's trial after having been held as a material witness. According to Johnson, the Mill Creek Playground at 51st Street and Parrish Street hosted a regular late-night basketball game that typically attracted a crowd. Johnson served as an informal disc jockey at these games, playing music, offering commentary, and performing rap music.

When Johnson arrived at the playground on the night of the shooting, Hampton was loudly arguing with some "younger guys from around the neighborhood" about his purchase of crack cocaine. Johnson walked Hampton to his car and attempted to calm him down. Hampton, however, returned to the playground and began yelling again. Johnson testified that when Hampton returned to the playground, he was standing with his back turned toward a group of men, including somebody known as "Rell." Johnson had met Rell at a prior basketball game and had known him for "about two weeks" prior to the shooting. Johnson said

Rell was holding a pistol. Rell and his group were standing behind and to the side of Johnson. Johnson heard four or five gunshots, saw the flash from a gun being fired in the corner of his eye, and witnessed Hampton fall after being struck.

Philadelphia Police brought Johnson in for questioning about the shooting about six months later, on the morning of December 23, 2006. He gave the police a signed statement approximately 33 hours later, at 9 p.m. on Christmas Eve. Johnson's statement to police, which he signed, largely tracked his trial testimony with a couple of critical exceptions. According to Johnson's statement, he viewed a photo array and identified a picture of Regan as "Rell." At trial Johnson testified that Robert Fetters, the Philadelphia Police detective who investigated Hampton's killing, had supplied the name "Rell." He further stated that that he did not see the person identified as Rell in the courtroom. He said that his prior identification of Regan "must have been a mistake." Once Johnson saw Regan in person in the courtroom, he became convinced that Regan was not "the one that shot [Hampton]."

Johnson maintained on cross-examination at Regan's trial that he was held in a windowless interview room in handcuffs for the entire time he was in police custody. He believed at the time he was considered a suspect in Hampton's killing. He said Fetters told him he could "leave after [he]

-3-

help[ed] them." On the night of Christmas Eve, Fetters brought a photo array of individuals and "basically pointed out the picture" of Regan. Johnson said he "went along with it." Once Johnson gave the statement, the police allowed him to leave the precinct despite an active bench warrant for his arrest in connection with a New Jersey criminal matter.

The Commonwealth impeached Johnson by calling Fetters as a witness, having him read Johnson's police statement, and examining Fetters about the circumstances around the statement. Fetters maintained that Johnson was always free to leave the interview room and was invited to do so multiple times. He said that Johnson had supplied the name Rell, that Johnson said he met Rell at a nearby deli prior to the shooting, and that Johnson seemed confident at the time he gave the statement that the photo of Regan in the array depicted Rell.

The Commonwealth also attempted to introduce the testimony of Cornelius James, another of the three purported witnesses. James had given the police a signed statement implicating Regan in the shooting but had later recanted his statement while testifying at Regan's preliminary hearing.

James gave his police statement to Fetters on August 7, 2006 after having spent five days in police custody in connection with his own unrelated charges. In the police statement, James said that he had known Regan his "entire life."

He identified Regan as "Terrell."  He said that Regan told him on the night of the shooting that he had "offed an old head."  James said that "old head" was a reference to Hampton, who was 38 years old at the time.  He then viewed a photo of a man who he recognized as Regan.  His signature appears on every page of the statement, including the page in which the police recounted his identification of Regan.

James recanted this statement at the August 8, 2007 preliminary hearing of Regan.  He testified that he was under the influence of phencyclidine, i.e., "PCP," at the time he gave the statement.  He denied ever seeing the statement or having signed it.  He also denied even knowing Regan.

At the beginning of Regan's preliminary hearing, the prosecutor handed his counsel a packet of information that included "the statement that Mr. James did give to detectives, a copy of his juvenile extract, his local Philadelphia cases that are pending and an NCIC/PCIC report and an FBI report."  The contents of the packet do not appear in the state court record supplied to this court.  Regan's counsel conducted a brief cross-examination of James during the preliminary hearing, mostly concerning discrepancies between the spelling of James's name and the signatures on his statement.  James referenced his criminal history, stating that he had his "own cases to worry about."  However, Regan's counsel did not delve further into

James's criminal history, which included significant felony charges that were pending either at the time James gave his police statement or when Regan's preliminary hearing occurred. Of note, James had been arrested and charged with 13 counts, including attempted murder, robbery, and aggravated assault, five days before his statement implicating Regan was recorded.

When James was brought to the witness stand at Regan's trial, he refused to answer any question asked by the court and the prosecutor, even after the court informed him he could be charged with contempt.  The court found him to be unavailable as a witness and permitted the Commonwealth to introduce his preliminary hearing testimony.[1]  The Commonwealth put a police officer on the stand to read James's testimony.  Then, the Commonwealth impeached James by recalling Fetters and having him read in full James's statement to the police.

During summations, Regan's counsel argued that the police had "extracted" the statements of Johnson and James through "psychological coercion."  He refenced the length of time both were held in police custody prior to them giving statements.  He argued that both witnesses were not credible given their significant criminal histories.  He also argued that

---

1.   There was an off-record side bar conference before this testimony was read.  The Commonwealth suggests in its brief to this court that Regan's counsel may have objected at that time, but there is no evidence in the record of an objection.

Johnson, rather than Regan, was more likely to have committed the shooting.

The prosecutor responded in her closing argument by arguing, among other things, that the police witnesses were credible by virtue of their long tenures on the police force:

> But if you notice, Ladies and Gentlemen, every time a police officer or detective would get up to testify, I usually asked them the first question. How long have you been with the Philadelphia Police Department? That is kind of a routine that I have, but I do it for a reason. And the reason being is that I want to establish that these are people who are in the career for the long haul. These are people that are dedicated to law enforcement, dedicated to protecting the city. They have built a career out of that. And in this case we had people with a lot of experience.
>
> So if you add this up, you are talking about men that have a total of 64 years on the line, their reputations, their ability as wage earners, their families' lives at stake.
>
> . . .
>
> Ladies and Gentlemen, ask yourself: Is it likely that they are going to lie on this defendant? There has been no evidence whatsoever that they knew who this person was. They didn't know him from a can of paint, so why are they going to risk everything . . . .
>
> They have no horse in this game so-to-speak other than that they are there to solve the crime.
>
> They are not there to put words in people's mouth. They are not there to force people to sign photos. And they certainly have no

        knowledge of Vasen Regan, known in the
neighborhood as Terrell Regan, until it is
brought to their attention by the people
that were there.

II

On November 20, 2008, the jury found Regan guilty of first-degree homicide, in violation of 18 Pa. Cons. Stat. Ann. § 2502(a), and possession of an instrument of crime, in violation of 18 Pa. Cons. Stat. Ann. § 907.  The court sentenced him to life in prison for the homicide conviction as well as a concurrent prison term of one to two years for possessing an instrument of crime.  Regan filed post-trial motions, which were denied.  Regan timely filed a direct appeal with the Superior Court of Pennsylvania in which he challenged the weight and sufficiency of the evidence as well as alleged prosecutorial misconduct.  The Superior Court summarily affirmed his conviction on October 18, 2010.  The Supreme Court of Pennsylvania denied Regan's subsequent petition for allowance of appeal on June 16, 2011.

     On March 7, 2012, Regan timely filed a petition under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541 et seq.  On January 12, 2017, the PCRA trial court denied Regan's petition.  See Commonwealth v. Regan, No. CP51CR00098402007, 2017 WL 10187731 (Pa. Ct. Com. Pl. Phila. Cnty. July 31, 2017).  On May 22, 2018, the Superior Court

affirmed the trial court's decision.  See Commonwealth v. Regan, No. 287 EDA 2017, 2018 WL 2307383 (Pa. Super. Ct. May 22, 2018).

Regan timely filed the instant petition for a writ of habeas corpus on April 8, 2019.  He initially filed the petition pro se.  Regan later retained counsel after the Commonwealth filed its opposition, and his counsel submitted a reply brief on his behalf.  The Magistrate Judge, who issued the instant Report and Recommendation on April 14, 2023, recommended that Regan's petition be denied.

III

The court reviews the Report and Recommendation of the Magistrate Judge de novo and "may accept, reject, or modify" its conclusions.  28 U.S.C. § 636(b)(1).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, guides the court's review of federal habeas corpus petitions challenging state court judgments.  Habeas relief may remedy a state court decision that is either "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable application of, clearly established Federal law, as determine by the Supreme Court of the United States." § 2254(d)(1).  To demonstrate that a state court misapplied federal law, the petitioner must show that the state court's application was "objectively unreasonable, not merely

incorrect." Rosen v. Superintendent Mahanoy SCI, 972 F.3d 245, 252 (3d Cir. 2020) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). However, "if a properly preserved claim was not addressed by the state court on the merits, the deferential standards of AEDPA do not apply." Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010).[2] When a state court has not decided an issue on the merits, the court reviews it de novo. See id. at 400.

IV

As mentioned above, Regan asserts that habeas relief is warranted because his trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments. He first contends that his counsel was ineffective for failing to object at trial to the Commonwealth's introduction of the testimony James gave at Regan's preliminary hearing. He argues that his constitutional right to confront a witness against him was violated by the introduction of the testimony.

The Supreme Court has established a two-prong test in Strickland v. Washington, 466 U.S. 668 (1984), for analyzing claims of ineffective assistance of counsel. Under the first prong, the petitioner must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel'

---

2. Regan presented every claim discussed herein to the PCRA trial court as well as to the Superior Court.

guaranteed the defendant by the Sixth Amendment." Id. at 687. That is, the petitioner must show that his counsel's performance "fell below an objective standard of reasonableness." Id. at 688. Under the second Strickland prong, the petitioner must show that counsel's errors caused him prejudice, that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Superior Court and the Magistrate Judge rejected Regan's claim of ineffective assistance of counsel on the ground that Regan suffered no prejudice from the admission of James's preliminary hearing testimony under the second prong of Strickland. See Regan, 2018 WL 2307383, at *8–9. The Superior Court and the Magistrate Judge never reached the first prong of Strickland, that is, the question of whether defendant's counsel's performance fell below an objective standard of reasonableness.[3]

The court agrees that habeas relief is not warranted but reaches this conclusion on different grounds. Specifically, the court holds that Regan's counsel was not ineffective for failing to object to the admission of James's preliminary

---

3. Because the PCRA trial court and the Superior Court did not decide whether Regan met his burden under the first Strickland prong, the court considers this issue de novo. See Appel, 250 F.3d at 210.

-11-

hearing testimony because its admission did not violate the Confrontation Clause.

The Confrontation Clause of the Sixth Amendment as incorporated into the Fourteenth Amendment provides a criminal defendant "the right . . . to be confronted with the witnesses against him." The Clause bars the admission of testimonial statements of a witness unavailable at trial unless the defendant had the opportunity to cross-examine the witness in a prior proceeding. Crawford v. Washington, 541 U.S. 36, 68 (2004).

Regan does not dispute that the trial court properly found James to be unavailable to testify at trial. Instead, Regan argues that the admission of James's preliminary hearing testimony violated the Confrontation Clause because his counsel had no meaningful opportunity at the preliminary hearing to cross-examine him regarding bias and credibility.

To satisfy the Confrontation Clause, the prior opportunity to cross-examine the declarant must be "full and fair" such that it permits the defendant's counsel to "'probe and expose [testimonial] infirmities' of an unavailable government witness." Ross v. Dist. Att'y of Cnty. of Allegheny, 672 F.3d 198, 206-07 (3d Cir. 2012) (quoting United States v. Owens, 484 U.S. 554, 558 (1988)). However, an opportunity for cross-examination may be full and fair even though the

-12-

defendant's attorney did not cross-examine a witness in a particular way or on a particular issue.  Instead, the critical issue is whether a "specific statutory or court-imposed restriction . . . on the scope of questioning" inhibited the ability to impeach the declarant.  Pennsylvania v. Ritchie, 480 U.S. 39, 53-54 (1987).

The testimony in question took place at a preliminary hearing in the Philadelphia Municipal Court.  As the Supreme Court has stated, a preliminary hearing serves a "limited" function, which is simply to ensure that there is sufficient evidence to proceed to trial.  See Barber v. Page, 390 U.S. 719, 725 (1968).  Similarly, Rule 542(D) of the Pennsylvania Rules of Criminal Procedure provides that the role of a court at a preliminary hearing is to "determine from the evidence presented whether there is a prima facie case that (1) an offense has been committed and (2) the defendant has committed it."  However, there is no statutory or other structural restriction in Pennsylvania limiting the right of cross-examination of a witness who is called to testify at a preliminary hearing.

Regan concedes that cross-examination is permitted at preliminary hearings in Pennsylvania but contends that it is not allowed on issues of bias or credibility.  He is incorrect that cross-examination is restricted in this way.  The Pennsylvania Supreme Court in Commonwealth v. Bazemore, 614 A.2d 684

-13-

(Pa. 1992), has ruled to the contrary.  It has recognized that the Confrontation Clause requires that the defendant must have a "full and fair opportunity" at a preliminary hearing to cross-examine a witness who later becomes unavailable before that witness's testimony may be admitted at a later trial.  Id. at 687.

In Bazemore, the court reversed the conviction of a defendant after the preliminary hearing testimony of a witness was introduced at trial because defendant's counsel had not been provided with the criminal history of the witness.  It held that admitting preliminary hearing testimony of an unavailable witness at trial violates the Confrontation Clause only "where the defense has been denied access to vital impeachment evidence either at or before the time of the prior proceeding at which that witness testified."  Id. at 688.

In addition to the lack of any statutory or structural restriction on cross-examination at preliminary hearings in Pennsylvania, nothing that occurred at the preliminary hearing in Regan's case that in any way restricted his trial counsel from fully cross-examining James.  The prosecutor for the Commonwealth produced to Regan's counsel "a copy of the statement that Mr. James did give to detectives, a copy of his juvenile extract, his local Philadelphia cases that are pending and an NCIC/PCIC report and an FBI report" at the beginning of

-14-

the preliminary hearing.  Moreover, the judge presiding over Regan's preliminary hearing did not inhibit in any way the breadth of counsel's cross-examination or its length.  In fact, toward the end of his cross-examination of James, Regan's counsel seemingly stopped on his own accord once James alluded to his own criminal history:

> Q: You're not a witness to this mention of a shooting here or anything?
>
> A: No.
>
> Q: You're not a witness to that?
>
> A: I got my own case to worry about.
>
> Q: What, do you have an open case going on now?
>
> A: Yes.
>
> Q: You, yourself have an open case. That's all I have.

Regan further contends that because his counsel was handed the materials about James at the beginning of the hearing, there was "no opportunity for counsel to have engaged in [a] detailed analysis" into the timing of James's police statement and concurrent pending charges.  This is essentially an argument that his counsel should have done more with the impeachment material, not that he was denied access.  In sum, defense counsel was not denied a full and fair opportunity as required under the Sixth Amendment to cross-examine James at the preliminary hearing.

The admission of James's preliminary hearing testimony did not violate Regan's rights under the Confrontation Clause. Any objection to the admission of James's preliminary hearing testimony would not have been fruitful. Regan's counsel cannot have been ineffective for failing to lodge a meritless objection. E.g., United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999). In sum, there is no violation of the first prong of Strickland. Consequently, there is no need to determine whether the Superior Court and the Magistrate Judge were correct in holding that the admission of the challenged evidence was prejudicial to Regan under the second prong of Strickland.

V

Regan also asserts that his trial counsel was ineffective for failing to object to statements in the prosecutor's closing argument. As mentioned above, Regan objects to the prosecutor's comments in which she vouched for the credibility of the police witnesses.

Regan claims that the prosecutor's argument unfairly tied the police witnesses' credibility to the lengths of their respective tenure on the police force. Specifically, he objects to the prosecutor's statements that detectives are motivated to be truthful so that they do not lose their jobs and jeopardize their "family's lives." He also highlights her assertions that

-16-

detectives "are not there to put words in people's mouths" or "force people to sign photos." These statements, he claims, "so infected the trial with unfairness as to make the resulting conviction a denial of due process" under Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

        The Superior Court held that the prosecutor's comments "were a fair response to arguments advanced by Regan's trial counsel during his summation and based on the evidence or proper inferences therefrom." Regan, 2018 WL 2307383, at *5. Indeed, Regan's counsel argued in summations, among other things, that the investigating officers had engaged in "psychological coercion" because they sought "the best case scenario of what they could get out" of the witnesses available in the case.

        Regan acknowledges his counsel's arguments but still contends that the prosecutor's comments exceed the limits of permissible fair response. This argument parses the reasoning of the Superior Court too finely given the deference this court owes to its conclusion under AEDPA. Reasonable jurists could find Regan's counsel invited the prosecutor's comments. See, e.g., Orie v. Sec'y Pa. Dep't of Corr., 940 F.3d 845, 850 (3d Cir. 2019). As such, the Superior Court's conclusion that the prosecutor's comments were fair response is not an unreasonable application of federal law. Regan's objections to the Report and Recommendation on this issue will be overruled.

VI

The court will deny the petition of Vasen Regan for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. No certificate of appealability shall issue because Regan has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 484 (2000).